The Fifth Circuit. We have two arguments this morning and that will end the sitting for this particular panel. First case of the day, Memorial Hermann, Accountable Care Organizations v. Commissioner of the IRS. We'll hear from Memorial Hermann first, I bet. Go ahead. Good morning. May it please the Court. The ultimate issue on appeal is MACO, Memorial Hermann Accountable Care Organizations, qualification as an organization exempt from income tax under Internal Revenue Code Section 501c-4. To reach a conclusion, this Court will first need to address whether the tax court applied the correct legal standard in evaluating whether MACO qualifies under 501c-4, which is a legal question that this Court reviews on a de novo standard. The two legal standards that are relevant in the context of 501c applications are, first, the substantial non-exempt purpose test, which applies in the context of 501c-3s, and, second, the primary purpose test, which applies in the context of 501c-4s. How would you best describe the difference between those two? Great question. So 501c-3s are entitled to much greater latitude, much greater tax treatment. So the substantial non-exempt purpose test envisions a much more narrow approach to eligibility. So if any substantial non-exempt purpose applies, then the potential charity is out of luck, whereas the primary purpose test, it's important to evaluate all of the activities that the potential nonprofit engages in, and if it is primarily for charitable purposes, then under 501c-4, the primary purpose test should govern. So our argument here is that the tax court applied the incorrect standard in applying the 501c-3 regulations, and the 501c-3 regulations are understandably much more narrow because 501c-3 nonprofits are entitled to much greater tax benefits. If you're a 501c-3 nonprofit, you receive charitable contributions from donors. You have tax-exempt bonds under Section 145. You are exempt from certain employment taxes, whereas C-4s are entitled to much greater latitude because they have completely different activities, and while the income from both C-3s and C-4s is tax-exempt, again, the tax benefits are tremendously different. And which circuits have, or have any circuits expressly embraced a primary purpose test? Yes. As to C-4s, there appears to be a split in the circuits. The Fourth Circuit and I believe the Eleventh Circuit embraced the primary purpose test for C-4s, whereas One Circuit embraces, well, seemed to combine the C-3 and the C-4 tests. And which circuit is that? I will get that. We saved five minutes for follow-up, so we will address that there. So again, the tax court applied the incorrect legal standard, concluding that petitioner fails to qualify as an organization under 501c-4 because it's non-MSSP, which is Medicare Shared Savings, so basically non-Medicare activities constitute a substantial non-exempt purpose. The tax court erred by adopting the substantial non-exempt purpose test containing the C-3 regulations rather than the primary purpose test and determined that the benefits that MACO activities applied to commercial insurers and health care providers by themselves disqualified the tax exempt status under 501c-4. But your people do not handle uninsured. Absolutely. Our client absolutely does handle uninsured. Where is that? Where does that say that in your briefing or anywhere in that? That includes both. I'm talking about not the Medicare. I'm talking about just somebody here out here has no insurance and is not in Medicare, and they come walking in. They're not part of it. So if they come walking in, they will be cared for immediately by Memorial Hermann, who is the 100 percent owner, if you will. Okay, but not this entity. This entity requires either insurance or Medicare. And the thing about Medicare is you get money as the person giving the medical work. It may be a little less. It may be a little coveyed. I mean, I understand the concept, but it's not the same thing as some random homeless person walking in with some problem, right? Because they aren't going to get any money from that person, and they aren't going to get any money from the government. That's just very different. And so that to me is what I'm wondering about you all thinking you're helping society. Well, if I have Medicare or I have insurance, no, I'm going to get care pretty much anywhere. Well, the help to society comes in the form of lowering the overall cost of health insurance. So these organizations came about as part of the Affordable Care Act in an effort to lower the overall cost, which benefits the uninsured and the Medicare and the insured. And so in terms of the overall cost, in the particular cost, about 65 to 67 percent of the costs were for Medicare-related patients. And so as part of the Affordable Care Act, these ACOs, the Accountable Care Organizations, were envisioned to work with the public industry and the private to overall lower the cost. And so there are various incentives that Medicare and others provide to lower the overall cost benefits for all, which benefit the uninsured as well as Medicare and the insured. So for purposes of the applicable standard, though, again, the- What's your best case for the proposition that you all are producing social welfare, general social welfare? Sure. So the best case is that our client serves the greater Houston community's health care needs, big and small. So people can walk in and get health care. The doctors are- No, I'm saying your best case. Sure, sure. Cite me a case. That's what I'm asking. Okay. Your best case that supports your argument on this point. So this is an issue of first impression. In the Fifth Circuit, in terms of the best case- Well, the best case in the most direct cases is actually Better Business Bureau, which supports the notion as to what applies to 501c3s. The best case in our favor, so the Better Business Bureau case, the Supreme Court, in evaluating a predecessor of 501c3, concluded that a single non-educational purpose, if substantial in nature, will destroy an exemption. The Treasury regulations at issue here came into effect 15 years later, and so the C-4 regulations explicitly adopted this primary purpose test. So the primary purpose test envisions, again, evaluating all of the potential purposes and comparing does that help the general and social welfare of the community. Also, it seems to me the IRS acknowledges that what Memorial Hermann and the ACO are doing substantially benefits cost savings incentives. That seems to be a lot of what's in your brief, that the overall medical care is maybe more efficient, more cost effective, and CBMMS are among the beneficiaries. But it also argues that even though there may be these, I don't want to say residual, you won't like that, but ripple effects into the greater community, the argument of the IRS is that does not mean that you are primarily engaged in exempt activities. And I have no doubt that Memorial Hospital, Memorial Hermann's fine institution provides good benefits, but I do think that's what we're looking at, what the IRS is saying on the C-4, is how does whatever these other benefits are, the 80 percent, the 10 percent, the 10 percent, just how much of what Memorial Hermann ACO is doing is actually going to something that would qualify more generally as general welfare, that that doesn't mean these ripple benefits doesn't mean that you are primarily engaged in that. You got a response? Yes. So the Affordable Care Act, under the Affordable Care Act, MHO's core function is to improve the overall cost of health care to the overall industry, which includes, in our case, more than 60 percent Medicare or public expenses. And so if those costs are going down through this Affordable Care program, the vision is that it helps all. So, again. Okay, but there's a lot of entities who try to make sure the money comes down so more people will come, you know, the grocery store, even some airlines, even the place you go buy your dress or your jacket or whatever. There's a lot of places that are trying to cubby the cost so that more people will be able to buy. If all of them were tax exempt, then all of us would be paying a million dollars a day, whether we make even $10 an hour. We would have to pay it all in taxes because there would be no taxes from companies. There's only a few companies that go, no, we're going to charge everything under the sun. Right? Right. But here, again, under the C-4 regs, explicitly the question is whether the activity is primarily engaged in promoting, in some way, in some way is the key, the common good and general welfare of the people of the community. But if a grocery store is trying to make the food cheaper, that is wonderful, but I can promise you they're not going to be tax exempt. Again, again, agreed. We are not a grocery store. We are 100% owned by a 5-1-C-3, and then the question is, is the primary activity, which is lowering health care costs and providing a greater community service, is that part of the vision of the C-4 regulations? Again, C-4 treasury regulations, C-4s are very, very broad. They apply to political activities in certain ways. So the interesting thing about the BBB is that the BBB ultimately, its educational arm became a nonprofit, and then its normal BBB arm that we're all familiar with is tax exempt under C-6. So the point is, there are very broad standards, and the question is, is MACO, Operated Exclusive Promotion of Social Welfare, and then under C-4, if it is primarily engaged in promoting, in some way, the common good and general welfare of the people of the community. Let me ask you, how is that any different, regardless of an ACO, than just a hospital that's trying its very best to provide quality medical care? You had the factor here of trying to control costs because that's necessary under the ACA, but it seems to me a hospital by itself is providing the kind of benefits that you're talking about at bottom, anyway, is providing the highest quality medical care to the community that it serves. And you have the actual additional benefit of trying to lower those costs, but just providing quality medical care seems to be sort of feeding into your argument about why a hospital generally ought to be taxed, even if it's not a nonprofit hospital. Yes, so most community hospitals, including ours, are, in fact, C-3s, and so the difference here is that Congress envisioned an incentive program to lower the overall cost because the historic hospital program in medical care was a fee-for-service program, whereby hospitals and other organizations would get paid by the activity performed, and so costs were exorbitant, medical costs were exorbitant. So as part of the ACO, the vision was create a program that incentivizes hospitals, medical insurance, Medicare to come up with a program that saves and benefits all, including the uninsured, including the Medicare. So for purposes of our request today, we are respectfully requesting that the court enter a decision in our favor and have the correct 501c-4 primary purpose test apply and evaluate the Medicare and non-Medicare activities, not in a vacuum, but as a whole to determine which activities are primary and conclude that MACO qualifies for exemption under 501c-4 under the primary purpose test. Alternatively, we respectfully request that the case be sent back to the tax court so that the tax court can properly evaluate our case under the C-4 standards. Thank you. Appreciate it. May it please the court. Julia Vetta for the commissioner. The tax court did not apply the 501c-3 regulations here. The tax court applied the statute. The statute states that an organization not organized for profit, but operated exclusively for the promotion of social welfare is an organization entitled to an exemption. Exclusively operated has been interpreted by the Supreme Court to mean that a single substantial non-exempt purpose is enough to destroy the exemption. That's the Better Business Bureau standard that's been cited here. That is the standard that the tax court applied. That is not, we submit, inconsistent with the regulations under C-4, which further articulate that standard to say that if you are primarily promoting the general welfare of the people of the community, you meet this standard, generally subject to exceptions, but if you are operating in a manner similar to a for-profit business, you do not. Now, the tax court did go through all of this reasoning, but did not specifically favor a regulatory test at the expense of a statutory test. It applied the statute, and consistent with the statute and the case law, concluded that MACO was not exclusively operated for the promotion of social welfare. I'll address each of those prongs in turn. And what is it that is not social welfare that they're doing? Because they say, well, we're just trying to lower the cost of great medical work. Why is that not social welfare? At some level, Your Honor, that may be social welfare, but that is not how they operate. The record does not indicate that they have resulted or produced any lowered costs as a general matter. What they do is they serve a limited subset of patients in the Houston community who are sent to them by insurers pursuant to contracts. Those insurers can be either Medicare or private insurers like Blue Cross Blue Shield or Aetna. So was my question about not taking care of uninsured people a fair question? Absolutely, Your Honor. Tell me your thoughts on that. That's an example of why the general welfare of the community is not paramount here. Case law, including the contracting plumbers out of the Second Circuit in 1973, People's Educational Camp Society in the Fourth Circuit, 1964, these cases interpret the Better Business Bureau standard to hold that if you are serving your members primarily and the general public secondarily, you are not operated exclusively for the promotion of social welfare. You're operating for your members. If there are second-order effects that are beneficial to society, that's laudable, that's commendable, but that doesn't get you a tax exemption for the reasons that you in particular were articulating five minutes ago. You're doing good, but you are not tax exempt. And here we have the fact that they're serving a limited membership pool. They do not accept uninsured persons. They only accept patients that come through an insurance referral, as far as this record indicates. You can't, as a member of the community, go onto their website and sign up for services. And if you are in the program, you're not even necessarily aware of it, because they are gathering data on you and coordinating your care and possibly routing your recommending procedures to your doctor. It's not entirely clear what services they are performing to the doctors, to the providers. But you, as a member patient, can still see any doctor you choose. You're not constrained to this organization. Okay, let me ask this. This is a hypo. If we ended up affirming, and they had a board meeting, we want to be tax exempt, how can we do it, and they called you in and said, please tell us, what do we need to change, what would you tell them? Well, the determination, first of all, is tax year by tax year. So affirming here would only have preclusive effect until they reorganized and came in with a new set of facts, and then they could reapply for tax exempt status in CRIPE. But they don't want to be exactly the same, because then they're likely to lose. So what I'm saying is, if they wanted to change, they could be tax exempt, and they called you in and said, Ms. Avita, please tell us, what do we need to do different? Well, I would start with the language of the statute and the case law. I would say you need to be operated exclusively for the promotion of social welfare. You're transacting a whole lot of business here for somebody who is operating. There's a commercial hue permeating your organization is the language from Better Business Bureau. Now, it's not a see-through. You don't need to be a charity, but you need to be open to the public. Anyone needs to be able to use your services. Anyone needs to be able to access your services. The pipelines through these insurers, these commercial payers and Medicare, are restrictive, and those are an impediment to recognition as a social welfare organization. All of the case law talked about, you're doing great things for veterans, or you're doing great things for women, or you're doing great things for a subcategory in need of great things. Great, that's good for you, but that doesn't get you an exemption under C-4 unless you're doing great things for everyone. Now, maybe the record could now show, after however long they've been in operation, since 2012, I guess 12 years, that they have created some net benefit to society. I would like to see that as well. I would like to see how have you reduced costs. How have you reduced costs for someone who's not a participating member of your organization? How has society actually benefited? And the tax court looked to this too. They said, have you coordinated at all with the state of Texas? Are you doing any outreach in Houston? What is the guy on the street in Houston getting from your activity here? There's a lot of streets in Houston. Any street in Houston would do, though. And you need to be on any street in Houston, not just specific streets in Houston, where the insurer's particular clients who are cost centers reside. If someone has a condition that an insurer flags and says, this patient is expensive, this patient keeps going into the emergency room when they need to be routed to a provider who can give them longitudinal care and cut down on these emergency room costs, the insurer uses an ACO and says, help this guy. Get him to a doctor so he can just see the same doctor over and over. And then there are participating physicians in the network, which is a sibling corporation, also a subsidiary of the Memorial Hermann Hospital, and they'll probably choose one of those doctors and say, hey, try this doctor. Honestly, I don't want to speak out of turn, because the record isn't entirely clear how the patient-facing element of this operation works. This is the best of our understanding, that patients are guided somehow from their referring insurer to a participating provider. So if you have the proper insurance, you have a good time with these folks. But you're saying the problem is it's not everyone. Houston's a big place in my memory. Well, several problems. First of all, you're not providing to everyone. And secondly, as you observed earlier, the insured are already insured. Their costs are getting covered no matter what. What MACO is doing is trying to reduce those costs and the net effect of that, the net benefit of that to the insurer. It's seamless to the patient. The patient is indifferent to what their insurer is paying. But the insurer is benefiting from the success. Well, that also keeps taxes down because you're getting paid less as the company. But that's not perhaps what they're really wanting. And that's a far later order effect. That doesn't happen immediately. Obviously, this is seen as a global initiative. The Affordable Care Act conceived this as how can we regulate an industry? How can we change these macro factors of where these cost centers are? And an ACO is one approach that says let's do it patient by patient. And the insurer is the tool that provides them with those patients. They're not providing health care. The providers aren't. They're not paying for health care. The insurers are. All they're doing is a consulting function. And they're doing it pursuant to contracts. That last point makes me been wondering about this as you spoke. It seems to me you're not really saying that providing service to the homeless person who walks in is the problem or central problem. It's the whole business model you seem to be saying is the problem, that whether it goes from 80% to 50% or whatever, the primary purpose of this is not going to fit in your understanding of C4 because of the way that 50% is working. Is that a fair statement? It is a fair statement. They can't fix it, I guess, is getting back to what my colleague was asking you. You're here as a lawyer advocating for the decision that the tax court made, so I'm not asking you to invent a new business model for them. But it does seem to me your position in the briefing and your argument is that the way they operate, not so much who they don't serve but who they do serve, is not going to fit C4. And it may not, but that's particular to this organization. You can have an ACO that is a full 501C3 that serves only the uninsured. You can have an ACO that is a for-profit organization. It does make a difference if they were serving the uninsured. To C4 it does. Yes, and so your answer to him made it sound like, oh, they can't fix it, but your answer to me made it sound like they could fix it. I think it would need to be a different type of entity to fix it, a differently organized and differently operating entity, and I tried to explain how I might envision that, although my vision is not. But they just allow uninsureds more fulsomely and so on and so forth. I'm not saying that's the only thing, but I'm just saying that would be part of it, right? It would absolutely be part of it. Okay, but it is doable for them to revise it. You said that earlier, that this is just covering the past, not the future. Yes, it is a facts and circumstances inquiry every time, every year. I will not suggest a position here that could be binding on the IRS without an actual factual record to go off of. I am pointing out issues with the record here that did influence the decision of the IRS in these particular circumstances. To speak to Judge Southwick's question, I am postulating that there can exist ACOs along the entire continuum. This one is itself. It's not trying to be purely charitable. It's not trying to be purely for profit. It's trying to thread the needle and be a C-4. Can it be a C-4 with its current operations, not with the breakdown of patients it serves, not with the volume of business it's getting from private insurers and revenues it's realizing from private insurers and costs that it's saving for private insurers? That's these facts and circumstances. Can this organization reorganize, which I believe was your question, in a way that could entitle it to C-4 status? I believe that is possible. And if I am a bad management consultant here at the podium and I'm not coming up with good ways to make it happen, I apologize for that. But I do believe that in a facts and circumstances approach, you do not need to be purely charitable to serve a social welfare purpose. If you are primarily engaged in... I'm guessing you're a litigation attorney, not a transaction attorney. 100%. The standard under the regulation for a C-4 is that you're primarily engaged in promoting in some way the common good and general welfare of the people of the community. In that language, people of the community is what we really focus on. You're serving everybody. The entire community, not simply your membership. And to address that particular point I spoke earlier about how you can open your membership more broadly to the community and certainly resolve that question more favorably to you. Now, other facts and circumstances are still relevant. When you look at their member-patient base, currently roughly 10% of those are insured by Medicare. Another 10% receive Medicare coverage from a private insurer and the remaining 80% are employer-sponsored, privately insured individuals. Just people who have insurance through their jobs. And that's not a general social welfare, civic betterments and social improvements model. That's an operating model more akin to, similar to an organization which is operated for profit is the standard in the regulation. And as long as the ACO here, MACO, is operating in a manner that is so similar to an organization that's operating for profit, then the IRS will scrutinize that and say, where's your social benefit? Who benefits here? What is the tax exemption serving here? And simply reducing costs globally for an industry that has a social-facing purpose is on this record not enough because that benefit isn't even shown. If the court has no further questions, we will rest on our brief and ask that you affirm. Thank you. Good morning. May it please the court. So MACO's ACO, the whole point of it is to be part of this movement to shift the economy for medical services from a fee-based model to a value-based model to the benefit of everyone, the benefit of insured, whether it's publicly or privately insured, and to the benefit of uninsured. And the MedPAC report that we cited on page 8 of our opening brief, it explains that private participation is necessary for this public solution. You need that critical mass. That was at least one of the words the MedPAC report used. It also used the term sufficient market power. And so you need participation both in the Medicare programs and in the non-Medicare programs. And together, because if you're only doing Medicare programs or you're only dealing with the uninsured, you're just going to drive doctors away from those segments and towards the private insured patients. That's not the point of the ACO. The ACO is trying to shift the market for medical services to make it for the whole community to bring it down. If you just do, you know, the Medicare program, it's like trying to clap with one hand. It's not going to work. You just don't have the sufficient market power to get to where you need to if you really are trying to serve an overall social welfare function. The IRS says, at least with the help of your argument, if you were serving indigent, those who, for whatever reason, haven't signed up for Medicare or not, private insurers, how would your ACO even connect with such people? Yeah, it could. So it's generally going to be like through a primary care physician. So if you're uninsured and you still get to a primary care physician, that primary care physician can route that patient to MACO's ACO, and they would participate in that medical care and trying to bring down those medical costs for that individual. And, again, as part of that overall, though, objective of bringing down the market, you know, forcing the market to change from fee-based to value-based. Okay. What evidence is there of that in the record? So, you know, so there's Mr. Vazquez described, you know, the whole background of this, which is the Affordable Care Act. You know, the MedPAC report explains what the purpose of it is. In terms of whether the extent to which the objectives have been achieved, I mean, it's a process. It's a movement. It's, you know, it frankly probably. And I could be wrong, but I think I understood the question to be, what in the record shows what percentage or how many referrals you have of uninsured patients? There's no information in the record that I'm aware of uninsured, you know, of the number of uninsured patients that were. But even if it's just a theoretical possibility, the point is they, you know, MAKO's ACO, it's available to uninsured, whether or not it's an efficient, you know, routing system to get from their primary care. How is it made available to them? It's available in the sense that if the primary care physician of an uninsured patient wants to participate or thinks this is a good candidate to participate in the ACO, they can refer it over to MAKO and MAKO will serve its function to try to reduce those, to try to manage those costs. And, I mean, the point, I think our point is, you know, the ACO needs to be looked at holistically. And, you know, without kind of extracting out just the non-Medicare portion and saying, well, that disqualifies the whole thing, because you need the whole thing in order to affect the market. And I'll just raise one other quick point. So this Court's decision is only going to affect MAKO's revenue. There may be other parties that benefit, unrelated third parties. To the extent they benefit, they increase their tax burden, they pay taxes. It's only MAKO's revenue that we're talking about. And MAKO's revenue, the government concedes on page 53 of their brief, no profit. Any excess, it goes up to a 501C3. It does not inure to the benefit of any private shareholder or any individual. And I'll just conclude by saying, you know, the government has recognized MAKO's ACO as a top performer. It really is part of this movement to reduce costs of medical services through changing the marketplace. And we believe that it does, its activities do qualify under C4. All right, counsel. Thanks to all three of you for bringing your arguments to us, help us understand this case. Take it under advisement.